# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00707-CV

---

### Y. M., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. 21-1771, THE HONORABLE JOE POOL, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellant Y.M. (Mother) appeals from the trial court's final decree terminating her parental rights to her three-year-old son, Christopher.[1]  In two issues on appeal, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings that statutory grounds for termination exist and that termination of her parental rights was in the child's best interest.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2).  For the following reasons, we affirm the trial court's termination decree.

---

[1]  For the child's privacy, we will refer to him by an alias and his family members by their relationships to him.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## FACTUAL AND PROCEDURAL SUMMARY

Mother is the biological mother of Christopher who was three-years-old at the time of trial.[2] Based on concerns of drug use and endangerment to Christopher's safety, the Texas Department of Family and Protective Services (the Department) removed Christopher from Mother's care on July 7, 2021, and the Department was awarded temporary managing conservatorship of Christopher the same day. On July 23, 2021, the Department filed a petition seeking termination of Mother's parental rights.

The trial took place over the course of two days. The trial court heard testimony from Mother, Department investigator Megan Paine, Hays County Sheriff's Deputy Andres Vega, Department caseworker Delaney DeSpain, multiple members of Mother's family, Christopher's guardian ad litem Carol Thompson, Foster Father, and parenting coach Cynthia Mueller-McMorris. The exhibits admitted at trial included the removal affidavit; Mother's court-ordered service plan; Mother's drug testing results; Mother's psychological evaluation; photographs of Mother's residence where she resided with her brother, sister-in-law, and their four children; and photographs of Christopher with Foster Family at their home.

Department investigator Megan Paine testified that the Department became involved in this case after receiving a referral alleging neglectful supervision of Christopher by Mother. Hays County Sheriff's Deputy Andres Vega testified that on July 7, 2021, he pulled over a vehicle during a traffic stop where he found Mother in the passenger seat. Vega testified that Mother was detained due to an outstanding warrant. After searching the vehicle, Vega found a tray of methamphetamine and marijuana located in the car. At the time the vehicle was pulled over, then-seven-month-old Christopher was in the back seat. Vega testified that

---

[2] The identity of Christopher's biological father is unknown.

Christopher was in a car seat but that he was not properly strapped in. After the search, both Mother and the driver were arrested for possession of a controlled substance and endangerment of a child. Paine testified that she performed a drug test on Mother and that the results showed Mother tested positive for methamphetamine, amphetamine, cocaine, and marijuana.

After Mother was released from custody, the Department initiated a safety plan. The safety plan required that Mother's live-in brother and sister-in-law would provide 24-hour supervision within sight and sound for contact between Mother and Christopher. Mother also agreed to drug test for the Department during this time; she tested negative for all illegal substances on a urinalysis test and tested positive for amphetamines, methamphetamines, and marijuana on a hair follicle test. Department caseworker Delaney DeSpain testified that shortly after the safety plan was initiated, Mother violated it by leaving the house with Christopher in the middle of the night, unsupervised by either her brother or sister-in-law. As a result, the Department filed for an emergency removal of Christopher and was granted temporary managing conservatorship of Christopher on July 23, 2021. The same day, Christopher was temporarily placed with his eventual Foster Family. Mother was allowed supervised visitation with Christopher twice per month for one hour.

After the initial adversary hearing, the Department performed a Family Strengths and Needs Assessment (FSNA) where the Department gathered information and considered Mother's input to help create the personalized family plan of service for Mother. DeSpain testified that the Department recommended a permanency plan of Family Reunification with a Concurrent plan of Unrelated Adoption, which meant that the Department's goal would be to place Christopher back in Mother's care on a permanent basis.

Both DeSpain and Mother testified about Mother's court-ordered service plan and her compliance with the plan. The trial court entered the requirements of the family service plan as orders of the court on September 21, 2021. The trial court's orders required Mother to, among other things, obtain and maintain legal and verifiable employment, attend, actively participate, and successfully complete Basic and Protective Parenting classes, actively participate in and successfully complete individual therapy to address any mental health needs, prepare a written financial budget, complete a psychological evaluation, and complete a psychiatric evaluation. The service plan also prohibited her from associating with known criminals or engaging in any criminal activity. Finally, the service plan required that she complete a drug and alcohol assessment (OSAR) and submit to random drug tests within 8 hours as requested by the Department.

DeSpain testified that Mother was compliant with several requirements of the family service plan. She testified that Mother provided proof of employment and income as an assistant manager at a convenience store, she completed a written financial budget, she received therapy for her depression and anxiety symptoms, she regularly engaged in her service plan's mandated drug screenings—consistently testing negative for all illegal substances—and she received certificates of completion for both the Basic and Protective Parenting classes.

Mother had a psychological evaluation on September 30, 2021, conducted by Richard Yuen, which was admitted into evidence. Yuen's report indicated that the diagnostic impression for Mother "was clouded by contradicting reports." The report indicated that Mother was complaining of symptoms of severe depression and anxiety but denied suffering from depression and anxiety to Yuen. In fact, she denied ever experiencing significant symptoms of depression or anxiety despite mentioning a previous suicide attempt; she stated that the suicide

4

attempt was more of a "cry for attention." Yuen's report noted that "it is unclear if [Mother] was not revealing her history in an attempt to appear healthier." Yuen noted that Mother "appear[ed] to have poor insight into her clinical state" and he recommended a treatment plan for Mother to focus on the symptoms of depression and anxiety. Mother engaged in therapy for several months until she was successfully discharged in May 2022.

DeSpain testified that Mother completed three parenting classes. Although Mother received a certificate for each of the classes, DeSpain testified, she believed that Mother "did not meet the requirements." She explained this belief by stating that she believed Mother's parenting actions after completion of the classes did not reflect that she had learned valuable parenting skills. As an example, DeSpain testified that Christopher had a known allergy to peanuts, and that in early summer 2022 Christopher had an allergic reaction to peanuts while in Mother's care. Instead of administering Christopher's EpiPen, Mother gave him Benadryl. When Christopher was dropped off with Foster Family the next day, his throat was red and swollen, prompting Foster Parents to seek medical attention. As a second example, DeSpain testified about an incident approximately one month later where Christopher had been very sick with viral pneumonia and was eventually hospitalized. Mother's scheduled weekend visitation took place shortly after he was discharged from the hospital. CASA and DeSpain spoke to Mother before the weekend visitation and suggested they stay at home and relax as Christopher was still recovering. Instead, DeSpain testified, Mother took Christopher to an outdoor "splash pad" in 100-degree weather in July to play and swim then took him out to eat. DeSpain testified that shortly after the splash pad incident, Mother told DeSpain that "she wanted CPS out of her life so that she could do what she wanted." After these two incidents, Mother's visits with Christopher went back to being supervised by the Department.

5

In November 2022, after demonstrating compliance with her service plan, including consistently testing negative for all substances on her drug screenings, Mother moved for the monitored return of Christopher, which the trial court granted in early February 2023. Only two months later, however, the Department moved to revoke the monitored return based on various observations of Mother's actions and her violations of the court-ordered family service plan. DeSpain testified that there were several reasons why the Department moved to revoke the monitored return. First, she testified that she discovered Mother's father (Grandfather), who was prohibited from being around the child unsupervised in the home, living in an RV on the property. When she found him, he was hiding in a bathroom in Mother's home; DeSpain later learned that he was regularly in Mother's home to eat and shower. This was a violation of Mother's family service plan as Grandfather was not permitted to be in the home with Mother and Christopher due to various instances of unverified criminal activity.[3] In addition, DeSpain testified that the Department learned that Mother had been in contact with a convicted murderer serving a life sentence in the Texas Department of Criminal Justice (TDCJ), which was also a violation of her court-ordered family service plan. Further, only two weeks after the monitored return was granted, an incident happened where Christopher's asthma flared up and Mother had his prescription medication but failed to administer it because she wanted to see if the flare-up would improve on its own. Finally, DeSpain testified that Mother took Christopher to work with her at the convenience store, where the Department observed Christopher taking a nap on the floor. The trial court granted the Department's request to end the monitored return, and Christopher returned to live with Foster Family in early April 2023.

---

[3] Evidence at trial demonstrated that Grandfather's criminal history could not be verified because his alleged crimes were committed outside the country.

DeSpain testified that the Department and CASA had been very supportive of the reunification process between Mother and Christopher from the start. She also testified that Foster Family was supportive of the reunification process, and that it was only "when things just got really bad" that they decided to "change course and offer their home as a permanent home for [Christopher]." DeSpain testified that the Department was concerned that Mother's parenting choices are impacted based on whether she is being supervised or unsupervised—when she is unsupervised, she does not make decisions in the best interest of Christopher. She stated that Mother acts selfishly, "in the sense of doing what she wants to do rather than considering what's going on with [Christopher] and his health." DeSpain testified that the Department could not rely on Mother's live-in brother and sister-in-law to supervise or help with Christopher, as the relationship among them is "very tense" and Mother has not reported them as part of her support system.

DeSpain testified that when she would visit Mother and Christopher at their home during weekend visitations or during the monitored return in early 2023, he would "seem very quiet and timid in [Mother's] room." She stated that she "didn't really ever observe him outside of the room" and that he would be "kind of hiding in the corner" and not "very verbal." DeSpain testified that, when in Mother's care, Christopher had no set schedule regarding when he ate, slept, or napped. DeSpain believed that, as a result, Christopher began acting out at school in the form of hitting; in one instance he choked another child. She testified that when the Department had several conversations with Mother about this, she would become defensive and push back. In response, the Department worked with CASA to create a detailed schedule for Mother to use. They discussed the importance of this schedule with Mother, explaining that the purpose was to

keep Christopher grounded, structured, and focused. However, as DeSpain testified earlier, Mother did not follow this schedule provided to her. DeSpain testified that now, while in Foster Family's care, she noticed a "complete change in [Christopher's] character traits." She also stated that Christopher's daycare at the time of trial currently reported that Christopher was "doing great" and there were no behavioral concerns or any "concerns in general."

DeSpain explained that the Department was concerned about the peanut and splash pad incidents because they both happened only one month after Mother had completed her second protective parenting class. DeSpain admitted on cross-examination that while Mother did not administer the EpiPen to Christopher after his exposure to peanuts, she nevertheless did treat his reaction by providing him Benadryl. She also admitted that at another time while Christopher began feeling ill while in Mother's care, Mother made sure to call Foster Family and ask for their recommended medication or course of treatment. Finally, DeSpain admitted that despite the Department's concerns, Christopher was never actually harmed as a result of either the peanut incident, the splash pad incident, or on the occasion when Mother brought him to work with her.

DeSpain also stated that, in the summer of 2022, the Department provided Mother with a parenting coach. The Department ended the coaching sessions between the coach and Mother in early December 2022 due to a "demonstration of lack of progress." DeSpain stated that the parenting coach unsuccessfully discharged Mother because she felt as if there was no more "help she could provide." Ultimately, DeSpain testified, Mother's actions showed that she had not learned anything from the required courses or parenting coaches. DeSpain testified she believed that Christopher would not be in safe hands if returned to Mother's care.

8

Carol Thompson, Christopher's guardian ad litem, testified that she has been on the case since the start and has been preparing monthly reports to the court. Thompson admitted that she had observed Mother and Christopher's interactions on a frequent basis and that all of Mother's supervised visitation with Christopher had been appropriate. Thompson admitted that Mother has demonstrated sobriety throughout this case. Thompson admitted Mother has shown she has the financial means to support a child and has shown she has had stable housing, as she has lived on the same property the entire time. Thompson admitted she did not investigate the perceived safety concern of Christopher sleeping on the floor at the convenience store.

Thompson testified that her main concerns with Mother were that she would not follow the plans that were given to her, she would not be honest about where she was, who she was with, or what she was doing. As an example, Thompson testified about a scheduled weekend visitation in July 2022 where Christopher was still recovering after being in the hospital. Mother told Thompson that she planned to stay in with Christopher that weekend in their hotel and watch movies and play with him in the room and cuddle. Instead, Thompson testified, Mother left the hotel with Christopher and drove, without a driver's license, to a party in San Marcos. When Thompson confronted Mother about this, Mother eventually admitted that she went to the party but denied being the driver. This was the same weekend Mother took Christopher to the splash pad in 100-degree weather despite Christopher recovering from viral pneumonia.

Thompson agreed with DeSpain's testimony that CASA and the Department attempted to reunite Mother with Christopher "multiple times," but that they ultimately "acquiesced" that Mother was not "the best choice for the child." Thompson stated that Mother has had three parenting coaches, and despite this, has not shown an effective ability to parent.

9

*Associations with known criminals*

Multiple witnesses at trial expressed their concerns about Mother's communications with men with criminal backgrounds, including an incarcerated individual (J.Z.).[4] DeSpain testified that she asked Mother directly about her relationship with him; Mother initially responded that she did not have any communication with him, but upon further pressing, she did admit to having communications with him and acknowledged that such communication was a violation of the court ordered service plan.

Mother testified about her relationship with J.Z. and admitted that, at the time of trial, she was still communicating with him. She stated that when she began communicating with J.Z., that she did not know why he was incarcerated. She testified that only after several months of communicating did she learn that he was serving a life sentence for murder. Mother attempted to downplay her relationship with J.Z. during the pendency of the case as well as at certain points in the trial; however the Department entered several exhibits at trial showing the extent of Mother's relationship with J.Z. The Department also introduced evidence of Mother and J.Z.'s sexually graphic conversations. Five days after J.Z. arrived at TDCJ, Mother sent him an email where she referred to him as her husband and that she loved him. At trial, Mother downplayed the meaning of "husband", stating that "it's something to say to a guy who's in prison for a long time . . . you know, something that he wants to hear, something that can make him happy." Mother also admitted that the two "hatched a plan" in order to have contact visits, which are typically reserved for family members. Mother and J.Z. mutually agreed to hold themselves out as aunt and nephew. Mother admitted at trial that she would do favors for J.Z.,

---

[4] Mother also admitted at trial that she corresponded with J.Z.'s brother, who was also in TDCJ custody at the time.

including talking to his friends about picking up money and envelopes. She admitted that she was "somewhat" carrying out things for J.Z. while he was in prison. She admitted that, at one point in time, she was sending J.Z. around $450 per month for about six months. This left her with a shortage of funds to pay for her and Christopher's basic needs, requiring her to apply to take out a loan but the loan was denied. In contrast, Mother admitted that she never sent any money to Foster Family while they were caring for Christopher.

Mother admitted that she loved J.Z. and perceived herself, J.Z., and Christopher as somewhat of a family. She sent several photos of Christopher to J.Z., explaining that she did so because J.Z. "wants to know him." She admitted that, at one point, her perceived relationship with J.Z. was more important to her than Christopher. In fact, during one of her unsupervised weekend visitations with Christopher, she drove with Grandfather and Christopher to a prison three-and-a-half hours away from her home in Kyle so that she could visit with J.Z. While Mother and J.Z. had their approximately two-hour visit, Grandfather waited in the car with Christopher. Mother admitted at trial that she did not notify anyone that she would be traveling to the prison with Grandfather and Christopher, nor did she seek permission. In fact, Mother testified that she was willing to move herself and Christopher to wherever J.Z. would be transferred while in TDCJ custody so that they could be close to one another. She stated she loves J.Z. and that J.Z.'s status as a convicted murderer was "not a deal-breaker" at this point in her life. She testified that she believes her relationship with J.Z. does not endanger Christopher in any way. When she found out that J.Z. was corresponding with another woman, she begged him not to end the relationship and threatened to commit suicide if he did.

Several of Mother's family members testified that they were concerned about not only J.Z. but the other men with whom Mother sought romantic relationships. Mother's cousin

11

(Cousin) stated that Mother has a "history of putting herself before everybody else" and that she "always chooses men, sex, drugs and money before everybody she loves," including Christopher. Specifically, Cousin referenced a time before Christopher was born where Mother invited a man into her home unaware of the fact that he was a registered sex offender who was convicted of the sexual assault of a six-year-old boy. In addition, Mother's aunt (Great Aunt) testified that she believed Christopher would not be safe in Mother's care because Mother is so "desperate to have a relationship with a man that she will bring anybody home whether they're fresh out of jail without any regard to her or any younger person being in the home." Great Aunt also testified that she had seen some of these men be violent with Mother. She testified that she believed Mother's choice in men "is not good."

Mother's parenting coach Cynthia Mueller-McMorris testified that she was first contacted to act as Mother's parenting coach in January 2023. She testified that she met with Mother a total of thirteen times. She did not note any concerns with Mother's parenting abilities during those sessions. Based on her observations, she testified that she had no concerns with Mother's ability to parent Christopher. However, at trial she was unaware of the fact that Mother was continuing to pursue a relationship with J.Z. She said that this news was concerning to her, considering the fact that she had had conversations with Mother about looking for red flags in relationships, specifically regarding J.Z. After learning this information, she testified that Mother communicating with J.Z. concerned Mueller-McMorris for Christopher's well-being and that it was not consistent with good parenting.

12

*Family members' testimony*

DeSpain testified that she spoke to some of the relatives living on the property with Mother and stated that they expressed concerns about Mother's parenting abilities and that they did not support the reunification of Christopher with his mother.

Great Aunt lives on same property as Mother. She testified that in 2019, Adult Protective Services investigated Mother for not taking proper care of Mother's terminally ill mother (Grandmother). In late 2019, Mother was paid by a state agency to be Grandmother's caretaker, which included bathing her, feeding her, and taking her to medical appointments. Great Aunt testified that Grandmother—Great Aunt's sister—was afraid to ask Mother for any type of help because Mother would tell her "I'm too sick, I don't feel well, I can't do it. If you can buy your own cigarettes, then you can give yourself a bath." Great Aunt also testified that she believed Mother would attempt to steal Grandmother's prescription medications from her. Great Aunt testified that Grandmother complained to her that Mother had not bathed her for an entire month. She also stated that Grandmother had noticeably lost weight. In addition, Mother would not drive Grandmother to chemotherapy appointments, resulting in her having to drive herself. Mother also failed to fill Grandmother's prescriptions on a regular basis. Based on her observations of Mother's lack of caretaking skills, Great Aunt testified that she believed it was in Christopher's best interest to have Mother's rights terminated. She explained that she felt as if Mother's needs seemed to "come before her child's."

Cousin mentioned a time in December 2019 when Grandmother came to Cousin's home to visit. She stated that Grandmother's clothes smelled like urine and that Grandmother expressed her belief to Cousin that Mother was stealing and hiding her pills from her. Cousin stated that Mother received government checks for the care of Grandmother for approximately

six months until Grandmother's death, even though, in Cousin's opinion, Mother never earned the money because she never rendered those services. Cousin testified that she would be "horrified" if Christopher was returned to Mother's care.

Cousin's husband testified and reiterated the same testimony as his wife, stating that he observed Grandmother "deteriorate quickly". He testified that Mother had told him and others several times that she could not handle caring for Grandmother, yet instead of stepping down and letting someone else care for her, "she herself stayed in that position and cash[ed] those checks." He testified that, in his opinion, Mother always seems to put Christopher's needs last. He stated that he would not trust Mother to be a caregiver to his three children and that he was in favor of terminating Mother's parental rights.

Mother's live-in older brother (Uncle) testified. Uncle's wife and four children currently live in the same home as Mother. Uncle stated that he moved into the home with Mother about a year after Grandmother died. He confirmed Great Aunt's account regarding Mother's caretaking abilities: he testified that he did not believe Mother did a good job of taking care of Grandmother during her final months. Uncle also testified that, in the event he and his wife could no longer care for their four children, he would not trust Mother to take over the primary caretaker role because of the constant "irresponsibility" he believes Mother has shown. A recovering addict himself, he expressed his concerns that his sister "is not strong enough" to remain sober. He expressed that he has tried to talk with Mother multiple times about her lifestyle and parenting abilities, and that she always refuses to listen. On cross-examination, however, Uncle admitted that Mother has made changes since the start of this case, including maintaining her sobriety and refraining from bringing romantic partners to the home.

14

Uncle stated that there is "a lot of tension" in the home living with Mother and that it is "a very toxic environment." Uncle stated he believed Christopher would not be safe in Mother's care and that it would be in Christopher's best interest that Mother's rights be terminated. He expressed his opinion that living in a safe and happy home with Foster Family would be best for Christopher.

Mother appeared to agree with at least some of her family's testimony, as she admitted at trial that she did not provide Grandmother with adequate care.

*Foster family*

Foster Father testified that Christopher was initially placed with his family in July of 2021 when Christopher was seven months old. At the time, they had no biological children. Christopher was in their care before going back to Mother in February 2023 for the monitored return. Foster Father testified that he and Foster Mother supported Christopher and Mother in the reunification process and hoped that Christopher could be returned to her care permanently. When Foster Father and Foster Mother learned that the monitored return fell through and that Christopher would be coming back to them in April 2023, Foster Father testified, they were "heartbroken" and began to consider the possibility of becoming Christopher's adoptive parents so that Christopher could live in a safe and loving home on a permanent basis. By that time, Foster Father testified, they had one biological child and another on the way. Foster Father testified at trial that he would be concerned about Christopher's future if he were to be returned to Mother's care.

Thompson testified that she met frequently with Foster Family throughout the case and observed their interactions with Christopher. She stated her belief that Christopher is

15

"very much" bonded with Foster Family, including the younger children in the home, and that he is "thriving." She stated that Christopher refers to Foster Parents as "Momma and Dad." When Christopher is being transported from Mother to Foster Family, he goes running toward them and seems excited to be going home. She stated she believes that Foster Family is able to provide for Christopher's future emotional and physical needs. Thompson stated that she did not believe Mother had the ability to provide for Christopher's future emotional and physical needs. Thompson agreed with Uncle's characterization that the home with Mother is "a very toxic environment." Thompson recommended that Mother's rights to Christopher be terminated so that Foster Family may adopt Christopher.

DeSpain also testified about her observations of Christopher's placement with Foster Family. She testified that she has been visiting Christopher with Foster Family on a monthly basis and that he was "exceptionally comfortable in the home" and "is very attached" to both his Foster Parents and their extended family. She further testified that he has hit all of his developmental milestones while with Foster Family. She stated that Christopher refers to his Foster Parents as "Mom and Dad" and that Christopher has bonded with them. Foster Father testified that Christopher was "an integral part" of their family, that Christopher is "best friends" with their biological son, who is less than a year and a half younger than Christopher, and that Christopher dotes on their two-month-old daughter.

Mother stated that Foster Parents are "perfect people" and that she wishes she was like them, but "that's not how [she] works." She testified that she was trying to live the right lifestyle for herself and her son. She stated she felt she deserved to be with Christopher, to spend time with him, to raise him and to see all of his future accomplishments.

16

On October 23, 2023, the trial court signed a Final Decree for Termination, finding by clear and convincing evidence that termination of Mother's parental rights was in Christopher's best interest under section 161.001(b)(2) and warranted under subsections (D) (endangering environment), (E) (endangering conduct), and (O) (failure to follow court-ordered service plan) under section 161.001(b)(1) of the Family Code. Mother timely filed this appeal.

## DISCUSSION

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence at least one statutory ground for termination and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630–31. In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed or conflicting evidence and consider whether the evidence "a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. An appellate court must "provide due deference to the decisions of the factfinder,

17

who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

***Statutory predicate grounds***

In her first issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under subsections (D), (E), and (O).[5] *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). We begin by analyzing the subsections (D) and (E) findings because of those findings' "significant consequences for future parental rights." *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Under subsection (D), a court may terminate parental rights to a child if the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D). Under subsection (E), termination may occur if the parent has engaged in conduct or knowingly placed that child with persons who engaged in conduct which endangers the child's physical or emotional well-being. *See id.* at § 161.001(b)(1)(E). Subsection (D) focuses on the child's physical environment, and the parent's conduct can be a factor in

---

[5] The Department also argues that Mother has waived her issues on appeal because her brief fails to cite appropriate authority to support them. *See* Tex. R. App. P. 38.1 (providing that appellant must provide clear and concise argument for contentions made, with appropriate citations to authorities and record); *see also Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 443 (Tex. App.—Austin 2004, pet. denied) (appellant's failure to cite any authority in support of its argument waives argument and leaves appellate court with nothing to review). Although we note that Mother's brief presented a less than thorough analysis of the facts as they relate to both the statutory grounds and best-interest findings, we decline to deem her issues as waived. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221–22 (Tex. 2017) (providing that appellate courts are to construe briefing "reasonably, yet liberally, so that the right to appellate review is not lost by waiver") (quoting *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008)).

producing an environment that threatens the child's well-being. *See J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). "A single act or omission can support termination under subsection (D), but termination under subsection (E) must be based on 'a voluntary, deliberate, and conscious course of conduct.'" *J.G.*, 592 S.W.3d at 524. A parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being. *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (stating that stability and permanence are paramount in upbringing of children).

In considering subsection (E), "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's physical or emotional well-being." *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). A parent's conduct that occurs before the person's children are born can be a relevant factor in establishing the endangering course of conduct required under subsection (E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that parent's history of "irresponsible choices" is probative evidence that parent has engaged in endangering conduct).

Evidence at trial showed that Mother has engaged in a pattern of putting her needs and desires above Christopher's. This case began as a result of Mother being charged with child

endangerment for allowing Christopher to ride in a car with her while she was high on marijuana and methamphetamine. *See E.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 02-22-00469-CV, 2022 WL 17970222, at *8 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op.) ("Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D).") (quoting *In re C.V.-L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied)); *In re J.T.G.*, 121 S.W.3d 117, 133 (Tex. App.—Fort Worth 2003, no pet.) (providing that endangering course of conduct may be established by evidence of criminal conduct, convictions, and imprisonment and its effect on parent's life and ability to parent). And while Mother maintained her sobriety going forward, the trial court nevertheless heard evidence about the many ways in which Mother continued to put Christopher in harm's way. The trial court heard evidence that, shortly before Christopher was born, Mother showed a pattern of romantic involvement with known criminals, including inviting home a registered sex offender in the fall of 2019, and the evidence showed that this pattern continued after Christopher was born because she had a romantic relationship with a convicted murderer throughout the pendency of the case. *See Wischer v. Texas Dep't of Family & Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151, at *7 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) (providing that, although parent's violations of court's order appeared minor, parent's continued contact with persons of questionable character was consistent with her prior behavior, and factfinder could reasonably have assigned greater significance to violations based on her prior conduct).

In response to the Department's evidence on endangerment, Mother points to the Department's evidence that she fully complied with the service plan, that all of her supervised

20

visits with Christopher were safe and appropriate, and that she had a permanent residence that was safe and suitable for Christopher. Mother also emphasizes successfully moving for the monitored return of Christopher. Despite these facts, however, the trial court heard evidence that the monitored return was eventually revoked because, among other reasons, Mother was directly violating the court order by associating with known criminals. In fact, Mother was still communicating with at least one incarcerated individual at the time of the trial, despite knowing it was a violation of the court's order. Mother testified that she wanted J.Z. to know Christopher "at a distance", but that testimony was belied by the evidence that Mother sent J.Z. several photos of Christopher, drove three-and-a-half-hours each way to visit J.Z. with Christopher in the car, and stated her intention to bring Christopher with her to follow J.Z. to wherever he may be transferred next.

Even in her own testimony, Mother never expressed an intent to discontinue her relationships and associations with known criminals; she stated that it was not "a deal-breaker" for her. This testimony validated the evidence showing that Mother has a pattern of putting her wants and needs—in this situation, her desire for a romantic partner—above Christopher's wants and needs. *See In re A.F.J.*, 576 S.W.3d 743 (Tex. App.—El Paso, 2019, pet. denied) (concluding that mother's decision to have relationship with currently incarcerated sex offender was irresponsible choice which endangered children's emotional well-being). Although Mother's compliance with the family service plan and her continuous sobriety and full-time employment showed that she had taken steps for her child to be returned, the trial court reasonably could have found credible the evidence of Mother's history of drug usage, criminal conduct, and irresponsible choices in making its endangerment findings.

21

The trial court heard the testimony of various witnesses and was entrusted with weighing their credibility, and we cannot second-guess those decisions. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (holding that appellate courts must defer to trial court's factual determinations, even in parental termination cases). Moreover, "a trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.).

Based on the record and the deference we must pay to the factfinder's determinations related to credibility, the trial court could have found by clear and convincing evidence that Mother had endangered Christopher—both by her course of conduct and by placing Christopher in an environment that threatened his well-being: the July 7, 2021 arrest of possession of a controlled substance and child endangerment, Mother's inability to grasp any parenting skills despite completing multiple courses and Mother's current and continuing romantic relationship with J.Z. that she has consistently prioritized over Christopher.

Thus, we hold that the evidence is both legally and factually sufficient to support the trial court's findings of statutory grounds under subsections (D) and (E). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.); *see also In re N.G.*, 577 S.W.3d at 237 n.1. Because we affirm the trial court's predicate ground findings of (D) and (E), we need not address the sufficiency of the evidence on predicate ground (O). We overrule Mother's first issue.

### Best Interest Finding

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the child's wishes, their emotional and physical

needs now and in the future, present and future emotional or physical danger posed to the child, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The child's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.— Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.— Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1. Although a strong presumption exists that a child's best interest is served by keeping the child with his or her biological parents, that presumption disappears when confronted with evidence to the contrary. *See In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.). Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

The evidence at trial showed that Mother has a history of making irresponsible choices, especially in relation to her romantic relationships. While some of her romantic interests may have pre-dated Christopher's birth, the evidence demonstrated that Mother never changed her behavior. At the time of trial Mother was continuing to demonstrate irresponsible choices—based on Mother's testimony that she "loved" J.Z., that she planned to follow him wherever he is transferred, and that she provided J.Z. with several hundred dollars on a monthly basis despite never sending money to Foster Family while they cared for Christopher. *See Holley*, 544 S.W.2d at 371–72 (providing that court considers present and future emotional or physical danger posed to the child in best-interest analysis).

The trial court also heard evidence contrary to its ultimate finding that termination of Mother's parental rights was in Christopher's best interest, including evidence that Mother loved Christopher, that she remained sober, gainfully employed, attended therapy for her mental health issues, and that she cooperated with the Department's service plan throughout the pendency of the case. However, the Department provided evidence of Mother's poor caretaking skills, as evidenced by Mother's inability to properly care for Grandmother. In addition, the Department also presented evidence that, while Mother technically complied with the service plan, including attending multiple parenting classes, her subsequent actions showed that she had not one, either learned anything from them, or two, implemented what she had learned. The majority of Mother's weekend visits with Christopher showed that she consistently failed to prioritize Christopher's needs: taking Christopher to a splash pad in extreme heat while he was recovering from an illness, sneaking out to attend parties with Christopher in tow, and leaving Christopher in the car with Grandfather for multiple hours while Mother visited J.Z. in prison. Several witnesses testified they were concerned about Mother's ability to safely care for

Christopher. Many, including Mother's own family members, testified that they would not entrust Mother with the care of their own children, and that Christopher's safety would be put at risk if he were to be placed with Mother permanently. One witness specifically stated her belief that placing Christopher back in Mother's care would be "horribly irresponsible." The only favorable testimony regarding Mother's parenting abilities came from Mueller-McMorris, who did not know that Mother was continuing to pursue a relationship with J.Z.; once Mueller-McMorris learned this during the trial, she admitted that Mother's actions were concerning to her. *See In re A.B.*, 437 S.W.3d at 503 (providing that appellate court must provide due deference to factfinder, who, having full opportunity to observe witness testimony first-hand, is sole arbiter when assessing the credibility and demeanor of witnesses).

Finally, the trial court heard evidence that Christopher had been placed with Foster Family on and off for the last two years—almost the entirety of Christopher's life—, that Christopher was bonded to his Foster Family, and that Foster Family was able to provide Christopher a safe, stable, and loving home. *See In re B.S.W.,* No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (parent's failure to show stability to parent "for any prolonged period" entitled factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption"). Multiple witnesses testified at trial that Christopher was doing very well living with Foster Family. Foster Father testified that Christopher was "an integral part" of their family and he expressed his family's desire to adopt Christopher to give him a stable, safe, and loving home. Thompson's testimony reflected Foster's Father's opinion that Christopher is "very much" bonded with Foster Family, including the younger children in the home. Thompson recommended that Mother's parental rights be terminated so that Foster

25

Family may adopt the children. *See L.R.*, 2018 WL 3059959, at *1 ("[F]actfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered") (quoting *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.))). Finally, in addition to Thompson, several of Mother's own family members expressed their belief that Christopher would be better suited being adopted by Foster Family.

Considering the totality of the evidence in light of the *Holley* factors, again giving proper deference to the trial court's determinations of witness credibility and the weight to be given to the evidence, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination is in the child's best interest. *See In re A.C.*, 560 S.W.3d at 630–31. Accordingly, we overrule Mother's second issue.

## CONCLUSION

Having overruled Mother's challenges to the evidence supporting the trial court's finding of best interest and of statutory grounds under subsections (D) and (E), we affirm the trial court's decree terminating Mother's parental rights to Christopher.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed: April 10, 2024

26